UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KIMBERLY ROBERTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | CASE NO. 1:07-cv-1219-DFH-WTL |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Kimberly Roberts seeks judicial review of a decision by the Commissioner of the Social Security Administration denying her application for disability insurance benefits.  Ms. Roberts suffered from severe back pain.  To alleviate the pain, she underwent four separate back surgeries from 2002 to 2006. Acting for the Commissioner, Administrative Law Judge (ALJ) James R. Norris determined that Ms. Roberts' back impairments were severe but that she was not disabled under the Social Security Act because she retained the residual functional capacity to perform sedentary work, provided that she was allowed to stand five minutes out of every hour.  The ALJ found that Ms. Roberts' allegations of total disability were not entirely credible because they were not supported by objective evidence in the record and were contradicted by her behavior at the hearing.  As explained below, the ALJ's decision is supported by substantial evidence and is therefore affirmed.

*Procedural History*

Ms. Roberts applied for a period of disability and disability insurance benefits on April 24, 2003.   Her application was denied initially and on reconsideration, and ALJ Norris held an evidentiary hearing at her request on on July 13, 2006.   On January 29, 2007, the ALJ issued an opinion denying Ms. Roberts benefits.   R. 33.   The Appeals Council declined Ms. Roberts' request for review, leaving the ALJ's decision as the final decision of the Commissioner.   Ms. Roberts asks this court to review the denial of her application.   The court has jurisdiction under 42 U.S.C. § 405(g).

*Background*

Ms. Roberts was born in 1957 and was 49 years old at the time of the ALJ's decision denying benefits.   R. 90.   She graduated from high school and attended some college classes.   R. 1071.   In the past fifteen years, she had held a variety of jobs, including quality lab technician (inspector/packer), title clerk, and school bus driver.   R. 1071-73.   Ms. Roberts' most recent job as an inspector/packer required her to lift 50 pounds between two and ten times per twelve-hour work day.   R. 212.   She last worked on October 28, 2002, the same day as the onset of her severe spinal impairments, R. 1071, though she had experienced back pain as early as July 1999.   R. 187, 370.

I.      *Ms. Roberts' Back Problems*

      A.      *Early Evidence of Spinal Degeneration*

In August 1999, a radiology exam showed mild degenerative changes in Ms. Roberts' lumbar spine.  R. 188.  In February 2000, another radiology report showed further degeneration, R. 189, leading Dr. Reilly, Ms. Roberts' family practice doctor, to diagnose degenerative disc disease and degenerative joint disease at the L4-5 vertebrae.  R. 189, 355.  Throughout 2000, Dr. Reilly treated Ms. Roberts' lower back pain with medication, R. 356, and a home exercise program, R. 385.  In December 2000, he referred her to Dr. Gabovitch of the Arthritis Care Center for further evaluation.  R. 383.  Dr. Gabovitch found Ms. Roberts to be well-functioning, and "it was difficult for [him] to get a handle on how symptomatic Mrs. Roberts was."  R. 385.  In March and April 2001, Ms. Roberts underwent a series of steroid injections to reduce her back pain.  R. 382, 417-18.  This treatment provided her with some relief.  R. 343.

In September 2001, Ms. Roberts reported no change in her condition, R. 348, and did not seek treatment again until March 2002.  At that time, Dr. Reilly prescribed medication for increased back pain.  R. 349.  In early October 2002, an MRI showed significant degeneration at the L4-5 vertebrae.  R. 192, 193.  Dr. Reilly prescribed additional medication, physical therapy, and a home exercise program.  R. 342, 686.

B.    *Back Injury and First Surgery*

In late October 2002, Ms. Roberts suffered an injury at work that caused symptoms consistent with a lumbar disc bulge.  R. 376-78.  Ms. Roberts visited Dr. Biel, an orthopedic surgeon, in November 2002.  R. 380-81.  He diagnosed degenerative disc disease and spinal stenosis.  R. 380.  Dr. Biel recommended surgical anterior spinal fusion of the L4-5 vertebrae and told Ms. Roberts not to work.  R. 380-81.  After this recommendation, she stopped physical therapy after attending two sessions.  R. 375.

On December 16, 2002, Ms. Roberts underwent her first spinal fusion surgery.  R. 166, 242-43, 264.  In physical therapy three days after the surgery, Ms. Roberts indicated that her back pain level was a three out of ten at a time when she was due for medication, suggesting a marked improvement in her condition.  R. 441.  X-ray reports a few days later showed proper placement of the inserted hardware, and her wounds were healing well.  R. 373.

Three months after the surgery, Ms. Roberts exhibited discomfort, the first sign of problems with that first surgery.  She appeared to be healing, R. 223, 403, but she experienced nighttime spasms and was tired.  R. 200, 336.  Dr. Biel prescribed physical therapy for one hour per day, four days per week for a month. R. 200, 336.  In April 2003, Ms. Roberts' lower back pain worsened, and she described pain in her legs and buttocks.  R. 156.  She was diagnosed with

trochanteric bursitis, which also required physical therapy.  *Id.*  Physical therapy seemed to aggravate her pain.  R. 216, 220.  As a result, Ms. Roberts discontinued physical therapy at the beginning of May 2003.  R. 219, 399.  She did not comply with the prescribed home exercise program either.  R. 208.

Ms. Roberts' doctors conducted additional tests to determine the source of her pain.  They suspected a fusion non-union, but an x-ray from a May 2003 post-operative visit to Dr. Biel showed the fusion to be healing "beautifully."  R. 222, 256.  Still, Ms. Roberts reported increased back pain.  R. 164, 199.  Dr. Biel prescribed a TENS unit (a nerve stimulator using electric current), a lumbar corset, and additional medication.  *Id.*  The TENS unit and the lumbar corset eased Ms. Roberts' pain to the point where she could walk better and garden again.  R. 218.

In July 2003, Ms. Roberts' x-rays showed excellent position of the hardware and nearly complete healing of the graft.  R. 163, 211.  At the same time, Ms. Roberts complained of on-going pain.  R. 163.  Dr. Biel was at a loss to explain why Ms. Roberts was not feeling better, and he released her to return to work with no restrictions other than her self-reported pain.  *Id.*  Ms. Roberts did not return to work because she did not feel she could.  R. 155.

On July 31, 2003, Ms. Roberts visited Dr. Hall, a pain management specialist, for left leg and back pain.  R. 160.  He diagnosed her with spondylosis

(spinal arthritis), R. 303, and sacroiliitis.  R. 161.  Over the course of the next two months, he administered steroid injections and nerve root blocks, and he prescribed a muscle stimulator device after observing Ms. Roberts' decreased range of motion and sensitivity to palpitation in her lumbar spine.  R. 158-59, 161, 176-80.  Dr. Hall also noted that Ms. Roberts sat in a chair in no apparent distress.  R. 161.  After the treatments, she experienced only temporary relief.  R. 157-59.

Ms. Roberts then visited Drs. Chase and Biel in October 2003.  See R. 181, 194, 197.  X-rays, CAT scans, and physical, motor, and sensory examinations were normal.  R. 197.  One CAT scan showed very mild canal stenosis above the L4-5 vertebrae, but there was no nerve damage in this area.  R. 194.  Most other neurological reports were normal as well, R. 157-59, though according to the reading neurologist, an electromyogram (EMG) showed abnormal results consistent with spondylosis.  R. 181.  Dr. Biel reported that neither the EMG nor the CAT scan showed any nerve impingement.  R. 196.  Following his evaluation, Dr. Biel could not see any surgical remedies for Ms. Roberts because he found her pain to be "elusive" and "somewhat surprising."  *Id.*  He referred her back to Dr. Hall, the pain specialist.  *Id.*

In December 2003 and again in February 2004, Dr. Hall conducted several medial branch rhizotomies, procedures that burn the nerve endings in the joints, to eliminate pain.  R. 721-22, 724-25.  Ms. Roberts obtained some relief only on

her left side from the first set, R. 723, and no significant relief from the later set. R. 720.

C.    *Additional Repairing Surgeries*

During a May 2004 visit to Dr. Hall the pain specialist, nurse practitioner Neff evaluated Ms. Roberts' October 2003 x-rays and determined, contrary to Dr. Biel's earlier opinion, that Ms. Roberts' spine was not properly fused after the first surgery.  R. 713.  Ms. Roberts decided to get a second opinion, R. 713, so she visited Dr. Reilly, her family practice doctor.  R. 716-17.  He prescribed additional pain medication and referred her to Dr. Sasso, an orthopedic surgeon.  R. 716.

As it turned out, the first surgery had not been successful.  In June 2004, Dr. Sasso found no abnormalities or spasms during a physical examination, but he suspected that Ms. Roberts' symptoms were due to pseudoarthrosis.  R. 710-11.  Dr. Sasso proposed two potential courses of treatment:  additional non-operative treatments or a second surgery to explore the first surgery's condition. R. 711.  Ms. Roberts agreed to undergo an exploratory surgery to examine the hardware and healing of her first surgery.  *Id.*

On July 23, 2004, Dr. Sasso surgically removed the original fusion hardware because it was loose, R. 770, and he found gross pseudoarthrosis, meaning no fusion of the L4-5 vertebrae.  R. 707, 852.  In a follow-up visit, Dr.

Nordmann prescribed additional pain medications and steroid injections, though he found no new problems after this second surgery.  R. 776-78.  The injections did not eliminate Ms. Roberts' pain, leading Dr. Nordmann to suspect that her pain may have been coming from an additional joint location below the L4-5 vertebrae, R. 776, so he administered steroid injections to that joint as well.  R. 770–71.  Because this procedure did not eliminate all of Ms. Roberts' pain, Drs. Nordmann and Sasso agreed that the pain likely emanated from endplate as well as joint locations.  R. 771.  As a result of their determination and her on-going pain, Ms. Roberts underwent another spinal fusion surgery on November 16, 2004.  R. 748-53.  In this third surgery, Dr. Sasso installed new hardware at the L4-5 vertebrae.  R. 749-51.

In March 2005, Ms. Roberts was doing very well and had discomfort in her lower back only after increased activity.  R. 837.  For this, the registered nurse prescribed anti-inflammatory medicine and recommended physical therapy.  *Id.* A month later, the nurse prescribed additional pain medications.  R. 860-61.  In July 2005, Ms. Roberts received another steroid injection in the sacroiliac joint because of increased low back, thigh, and calf pain.  R. 826, 854.  Post-injection, Ms. Roberts reported "no more than" a 50 percent reduction in pain.  R. 826.  The pain specialist performing the injection conducted a series of psychological and disability diagnostic tests.  See R. 817-822.  The results showed a predilection for depression and a possible propensity for complaining of symptoms that appear to have no physical cause.  R. 824.

Throughout 2005, Dr. Reilly prescribed additional pain medications. See R. 842-43, 912, 916. In November 2005, Ms. Roberts returned to Dr. Sasso for additional evaluation due to on-going pain. R. 874. Dr. Sasso could not determine the exact cause of her symptoms, and he prescribed physical therapy because Ms. Roberts had not done any since her surgery a year prior. *Id.* She attended four land-based physical therapy sessions in November as well, but was discharged because she could not perform this type of therapy without pain. R. 881-82, 974. The physical therapist noted that Ms. Roberts did not wear her lumbar corset, though she had been instructed to do so. R. 881.

Because physical therapy was ineffective and because Dr. Sasso could not determine the cause of Ms. Roberts' symptoms, Dr. Sasso recommended a fourth surgery to explore the previous fusion. R. 974. On February 9, 2006, Dr. Sasso performed the surgery, examined the bone, and removed the hardware that he had installed during the third surgery. R. 918. He determined that the previous fusion was then successful and demonstrated a solid fusion. *Id.* Post-operative reports in March and August 2006 showed that Ms. Roberts' condition improved significantly, there were no neurological or other abnormalities, and she was progressing satisfactorily. R. 971-72. She was walking on a daily basis and had decreased her pain medications. R. 971.

*Testimony at the Hearing*

Ms. Roberts testified that she could not be present regularly at any of her previous jobs because she could not sit or stand for very long due to pain in her lower back, left buttock, and knee.  R. 1074-75.  She stated that she spent most of her time reclined one-third of the way back in her reclining chair and that she did not think that she could work at a sedentary job because she had experienced constant pain.  R. 1078-79.  She testified that there had been no time since October 28, 2002 that she could have worked on a regular basis at any of her previous jobs.  R. 1079.  She stated that, if she had a job, she probably could not get out the door and to work three or four days out of a week.  *Id.*  She testified that she had trouble walking, particularly on uneven ground.  R. 1075.  She stated that she had difficulty with stairs and took them one step at a time.  R. 1076-77.  She also testified that she used a grocery cart to stabilize herself while shopping.  R. 1075-76.  She testified that she could not vacuum but could sweep, that lifting a gallon of milk hurt her, and that she could load the top but not the bottom rack of the dishwasher.  R. 1076-77.

When questioned regarding her mental state, Ms. Roberts stated that she had difficulty concentrating, and she misplaced things.  R. 1077.[1]  She testified that she was not involved in any social activities, but that she used to be a social person.  R. 1081.

---

[1]Though Ms. Roberts had a history of depression, R. 355, and had demonstrated some concentration problems, R. 618-19, a state agency psychologist examined Ms. Roberts' psychological records and determined that she had a mood disorder that was not severe.  R. 310.  The ALJ agreed, R. 21, and Ms. Roberts has not pursued that issue in this judicial review.

Stephanie Archer, a vocational expert, testified that a hypothetical individual of Ms. Roberts' age with a high school education who was limited to doing sedentary work could engage in skilled and semi-skilled clerical work, including the position of title clerk.  R. 1084-85.  She also testified that given a mild limitation on the ability to concentrate, these jobs could still be performed. R. 1086-87.  Archer also testified that if the person had to be able to stand for five minutes every hour, the jobs could still be performed.  R. 1087.  She stated that incontinence would not eliminate any of those jobs either.  R. 1088.  However, based on her experience with placements, R. 1093, Ms. Archer testified that missing one or two days of work each week or not staying at work the full required hours would eliminate these jobs.  R. 1088.

Dr. Pritcher, the psychologist called as an expert witness, testified that one of the psychological evaluations determined that Ms. Roberts might have some problems with concentration and depression, but that these limitations would not affect her ability to work.  R. 1036-38.

Dr. Hutson, the expert orthopedic surgeon, testified that Ms. Roberts had degenerative disc disease and posterior paraspinal muscle nerve damage as a result.  R. 1050.  He testified that Ms. Roberts could participate in sedentary work, but he recommended that she be able to stand up for five minutes out of every hour.  R. 1043-44, 1046.  Dr. Hutson also testified that from about July 2, 2003, until the discovery of Ms. Roberts' pseudoarthrosis (the non-fusion after the

first surgery), the pain might have made it difficult for her to maintain full time work.   R. 1056.   He also explained that the muscle spasms Ms. Roberts experienced were likely caused by arthritis and could be aggravated by sitting.   R. 1060-61.   Contrary to Dr. Reilly's opinion, Dr. Hutson thought the objective medical record indicated that after the fourth surgery, Ms. Roberts would be able to maintain regular work attendance.   R. 1044.   He also stated that he thought the record showed that Ms. Roberts could lift ten pounds, R. 1051, and that tenderness to palpitation was an objective finding and not a subjective one.   R. 1066-67.

*Statutory Framework for Determining Disability*

To be eligible for disability insurance benefits, Ms. Roberts must establish that she suffered from a disability as defined by the Social Security Act (Act) in 42 U.S.C. § 423(d). Under § 423(d), a disability is an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of no less than twelve months. If a claimant's impairment is listed in Part 404, Appendix 1, Subpart P of the implementing regulations, and if the duration requirement is met, then disability is presumed. 20 C.F.R. § 404.1520(d). Otherwise, a claimant can establish disability only if her impairments are of such severity that she is unable to perform both work that she has previously performed and all other substantial work available in the national economy. 20 C.F.R. §§ 404.1520(f) and (g).

This standard is a stringent one. The Act does not contemplate degrees of disability or allow for an award based on partial disability. *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985). Before tax dollars are available for disability benefits, including taxes paid by people who work despite significant pain and disability, it must be clear that the claimant has an impairment severe enough to prevent her from performing virtually any kind of work. Under the statutory standard, these benefits are available as a matter of nearly last resort.

The implementing regulations for the Act provide a five-step sequential evaluation of a disability insurance benefits claim.  See 20 C.F.R. § 404.1520(a)(4).  The steps are:

(1)    Is the claimant currently employed?  If so, she is not disabled.

(2)    If not, does the claimant have a severe impairment or combination of impairments?  If not, she is not disabled.

(3)    If so, does the impairment meet or equal an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. § 404?  If so, the claimant is disabled.

(4)    If not, does the claimant retain the residual functional capacity to perform her past relevant work?  If so, she is not disabled.

(5)    If not, according to the claimant's residual functional capacity, age, education, and work experience, can the claimant make an adjustment to other work?  If so, she is not disabled.  If not, she is disabled.

When applying this test, the burden of proof rests on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

*The ALJ's Disability Determination*

Applying the five-step process, the ALJ found that Ms. Roberts satisfied the first step.  She had not performed any substantial gainful activity since the onset of her spinal impairment in October 2002.  R. 18.  At the second step, the ALJ credited medical evidence to support his determination that Ms. Roberts' severe impairment was low back pain after a healed lumbar fusion.  R. 18, 21.  Though

Ms. Roberts was also diagnosed with depressive disorders, she did not have a severe mental impairment that would impose limitations on her ability to work. R. 21, 310. Ms. Roberts' spinal impairment did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 that would have automatically qualified her for benefits at step three. R. 22. At step four, the ALJ found that Ms. Roberts had the residual functional capacity to perform some of her past relevant work. R. 32. Based on the vocational expert's testimony and the testimony of the expert orthopedic surgeon, the ALJ determined that Ms. Roberts could return to her title clerk position, though she would be unable to perform her past jobs as either a lab technician or a school bus driver. *Id.* At step five, the ALJ determined that Ms. Roberts retained the residual functional capacity to perform sedentary work provided that she was allowed to stand for five minutes of every hour non-consecutively. R. 31. According to the opinions of both the expert orthopedist who appeared at the hearing, R. 1043-44, and a medical consultant who reviewed the medical records, R. 339, Ms. Roberts' impairments were not so severe as to qualify her as disabled and unfit for sedentary work. The ALJ therefore denied Ms. Roberts of disability insurance benefits. The ALJ also considered granting Ms. Roberts benefits for a closed period of disability from the impairment onset date in October 2002 until after her third surgery in July 2004, but found that was not consistent with the evidence. R. 31.

*Standard of Review*

If the Commissioner's decision is supported by substantial evidence, it must be upheld by a reviewing court. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict as long as it is supported by substantial evidence. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or if the ALJ based the decision on serious factual mistakes or omissions, *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). The ALJ has a basic obligation to develop a full and fair record, *Nelson*, 131 F.3d at 1235, and must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings, *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). If the evidence on which the ALJ relied does not support the conclusion, the decision cannot be upheld. *Id.*

*Discussion*

Ms. Roberts argues that the ALJ erred in determining her residual functional capacity.  Ms. Roberts also contends that the ALJ relied on evidence of her daily living activities to deny her claim, but that these activities are not inconsistent with an inability to sustain full time work.

I.    *Residual Functional Capacity Analysis*

First, Ms. Roberts contends that the ALJ's residual functional capacity finding is based on an incorrect determination that Dr. Biel's December 19, 2002 surgery successfully fused her spine at L4-5.  Pl. Br. 13.  Second, she argues that the ALJ incorrectly assumed that a lack of pain complaints meant that her spinal fusion was solid.  Pl. Br. 14.  Third, she contends that Dr. Hutson's testimony suggests that she could not sustain full time sedentary work.  Pl. Br. 18.

A.    *Fusion after the First Surgery*

Ms. Roberts argues that the ALJ wrongfully based her residual functional capacity on an incorrect finding that her December 2002 spinal fusion surgery was successful.  Pl. Br. 13.  The ALJ did not state erroneously that this first surgery was successful.  He found that there was no evidence in the record of a fusion mal-union from the first surgery, R. 25, but that did not indicate a successful surgery.  The ALJ noted that there were conflicting reports regarding

the fusion's success, but that Ms. Roberts' second surgery confirmed that the first surgery was unsuccessful.  *Id.*  There was gross pseudoarthrosis, a non-union (as distinct from mal-union) of the L4-5 vertebrae.  R. 778.

Dr. Biel, who conducted the initial fusion surgery, based his evaluations of the successfully healing fusion on myelogram and CAT scan images alone.  R. 196.  His May 2003 report, R. 222, stating that the fusion was "healing beautifully" conflicted with Dr. Sasso's later report diagnosing pseudoarthrosis. See R. 711.  Dr. Sasso's exploratory surgery (the second surgery) definitively confirmed that the first spinal fusion surgery was unsuccessful.  R. 705, 778.

Since that exploratory surgery, no doctor has contested that the first surgery resulted in a non-union.  Dr. Hutson agreed that Ms. Roberts had a pseudoarthrosis after the first surgery, R. 1053, but that after the second fusion surgery (third surgery overall), her spinal fusion was successful.  R. 1042. Another exploratory surgery and removal of hardware on February 9, 2006 confirmed that there was finally a solid fusion at L4-5.  R. 919.

B.     *Lack of Immediate Pain Complaints*

Ms. Roberts contends that the ALJ erred in his finding that she did not report any pain complaints until nearly six months after her December 2002 surgery.  Pl. Br. 14.  Ms. Roberts complained of pain as early as three months after the surgery, Pl. Br. 14, but the ALJ's finding that the first "significant complaints" of pain occurred in May 2003 is consistent with the medical evidence and opinions.

The ALJ is not "required to give full credit to every statement of pain, and require a finding of disabled every time a claimant states that she feels unable to work."  *Pope v. Shalala*, 998 F.2d 473, 486 (7th Cir. 1993), overruled on other grounds, *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999).  However, the ALJ is required to consider statements of the claimant's symptoms, including pain, and how these symptoms affect her daily life and ability to work.   20 C.F.R. § 404.1529(a).

The record shows that, at a scheduled post-operative examination in March 2003, Ms. Roberts reported experiencing muscle spasms and fatigue.  R. 200, 336.  In April 2003, she described having low back and leg pain and numbness,  R. 156, and reported swelling and spasms at the surgical site.  R. 214.  These reports, however, do not contradict the ALJ's finding that Ms. Roberts' first "significant complaints" of recurring pain occurred in May 2003.  R. 26.  As Dr. Hutson

testified, muscle spasms, such as the ones Ms. Roberts reported in March 2003, can be an indicator of pain or arthritis and are a normal reaction by the muscle to allow irritated tissue to rest and heal. R. 1059-60. Ms. Roberts made these complaints at routine post-operative visits and a physical therapy session. According to Dr. Biel, these pain complaints appeared to be consistent with the pain associated with surgical healing. R. 164, 200. Ms. Roberts was only a few months out of surgery. It is clear from the physical therapy report in April 2003 that her surgery had not healed yet because the surgical site was swollen and exhibited muscle spasms. R. 214. Thus, the March and April 2003 pain complaints are consistent with pain from Ms. Roberts' fusion surgery and are not "significant complaints" that necessarily indicated a pain problem lasting twelve months or more.

The ALJ thus did not err in addressing the results of the first fusion surgery or the timing of her first "significant complaints" of pain. After the fourth surgery, Ms. Roberts' spine was properly fused, and the ALJ's opinion shows that he understood that: "There seems little question that at this point the claimant's fusion was solid." R. 29. The ALJ's determination that Ms. Roberts had the residual functional capacity to perform sedentary work was ultimately based on the fact that her spine was properly fused, and not on the particular timing of when the fusion took place or when she first complained of pain.[2]

_____

[2]In this judicial review, Ms. Roberts has not argued that the ALJ erred in failing to award disability benefits for a closed period beginning in late 2002 and
(continued...)

C.      *Dr. Hutson's Testimony*

Ms. Roberts contends that the ALJ incorrectly interpreted Dr. Hutson's testimony to mean that she was capable of limited sedentary work.  Pl. Br. 15. Ms. Roberts asserts that the ALJ erred by considering only Dr. Hutson's original residual functional capacity opinion.  *Id.*  She argues that the ALJ should have considered the entirety of Dr. Hutson's opinion, including the testimony that addressed Ms. Roberts' subjective pain.  Pl. Br. 17.  Based on this record, Ms. Roberts' theory that the ALJ incorrectly interpreted Dr. Hutson's opinion does not show reversible error.

The ALJ found that Dr. Hutson concluded that the clinical record indicated a residual functional capacity greater than Ms. Roberts alleged.  R. 30.  Ms. Roberts argues that, on cross-examination, Dr. Hutson qualified his residual functional capacity opinion.  She contends that he affirmed that her ability to work may vary depending on her pain level.  However, Dr. Hutson found her able to perform sedentary work based on the objective medical evidence, but did not evaluate the credibility of Ms. Roberts' subjective pain complaints.  R. 1050.  In his testimony, Dr. Hutson agreed that, depending on her pain level, Ms. Roberts' ability to perform sedentary work may vary from his assessment.  *Id.*  However, his opinion was based on objective medical records alone.  R. 1051.  He refused to evaluate the credibility of Ms. Roberts' pain complaints, R. 1050, leaving the

[2](...continued)
ending when the fusion surgery was finally successful.

ALJ to make his own credibility determination.  The ALJ did not err in interpreting Dr. Hutson's testimony because Dr. Hutson did not testify as to the validity of Ms. Roberts' pain complaints.

II.      *Credibility Determination*

Ms. Roberts asserts that the ALJ erred in relying on her daily living activities in denying her claim.  Pl. Br. 18.  She contends that "her activities do not evince an ability to sustain full-time work eight hours per day, five days per week."  *Id.* Ms. Roberts' eligibility for disability insurance benefits rests on her overall credibility.  The ALJ had the power and the duty to resolve issues of credibility, and he did not err in doing so.  Having considered the necessary factors in determining the weight of Ms. Roberts' account of her symptoms and limitations, the ALJ found her subjective complaints "not entirely credible."  R. 30.  Ms. Roberts' statements regarding her symptoms and limitations were unsupported by "substantial  evidence in the record."  *Id.*

In making a credibility determination, the ALJ must give specific reasons for the weight given to the claimant's statements so that the claimant and subsequent reviewers will have a fair sense of how the claimant's testimony was assessed.  See *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003); *Steele v. Barnhart*, 290 F.3d 936, 941-42 (7th Cir. 2002); Social Security Ruling 96-7p, 61 Fed. Reg. 34483, 34486 (July 2, 1996).  The ALJ must consider the intensity

and persistence of the claimant's alleged symptoms.  The ALJ considers these factors in light of medical evidence and any other evidence of the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment other than medication for relief of pain; and other measures taken to relieve pain.  20 C.F.R. § 404.1529(c)(3).

After considering whether the evidence shows that the claimant acts on a day-to-day basis as a person who is suffering from the symptoms the claimant has alleged would act, the ALJ makes a credibility determination.  20 C.F.R. § 404.1529(c)(4).  Ordinarily a credibility finding by an ALJ is binding on a reviewing court unless that finding is based on errors of fact or logic.  *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006).  The court ordinarily will not set aside an ALJ's credibility determination as long as it is supported by the record and is not "patently wrong."  *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).  A remand is required when the ALJ makes findings based on "serious errors in reasoning rather than merely the demeanor of the witness."  *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004).

The ALJ made a reasoned credibility finding to discount Ms. Roberts' subjective complaints.  The ALJ determined that Ms. Roberts suffered pain from her medical conditions but that the medical evidence did not definitively establish a clinical cause for her pain, R. 29-30, and did not suggest any difficulty in sitting.

R. 31.  For Ms. Roberts' symptoms to diminish her capacity for work, they must "reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. § 404.1529(c)(4).  The ALJ asserted that Ms. Roberts' pain symptoms were not consistent with clinical reports, so he did not find them to have diminished her capacity for limited sedentary work.

In making this determination, the ALJ relied on several medical reports. See R. 26-28.  He cited treatment records from Drs. Biel, Reilly, Hall, and Sasso showing that Ms. Roberts demonstrated no significant deficits in motor strength or neurologic function after the first surgery, additional reports from Dr. Sasso describing normal lumbar stability, Dr. Hall's report of relatively normal gait, and a nurse's report detailing similar findings after the second surgery.  See R. 26-27.

The record contains additional medical evidence supporting the ALJ's opinion.   In 2005, a pain specialist, Dr. Ratzman, conducted a physical examination and administered a number of psychological and disability tests.  See R. 817-24.  He found no major abnormalities in Ms. Roberts' physical or neurological exams.  R. 824.  He noted only some tenderness to palpitation and thigh and calf muscle tightness in a straight leg exam.  R. 824.  Three additional evaluations in 2005 and 2006 by Dr. Sasso showed no physical or neurological abnormalities.  R. 874, 971, 989.  In Dr. Sasso's most recent report, Ms. Roberts indicated that she had improved significantly, had decreased her pain medications, and was walking daily.  R. 971.

Only Dr. Reilly, Ms. Roberts' family physician, reported that Ms. Roberts should be considered totally disabled.  R. 876.  His opinion, however, is from November 2005, before Ms. Roberts' final surgery in February 2006.  The ALJ rejected Dr. Reilly's opinion, noting that "no other treating or examining medical source specifically concurred with Dr. Reilly's opinion regarding the claimant's ability to work."  R. 31.

The ALJ also considered that Ms. Roberts' treatment included a number of pain medications, including methadone and Oxycodone.  *Id.*  Dr. Reilly reported that Ms. Roberts tolerated this medication poorly due to nausea,  R. 641, but she continued to take these and a number of other different pain medications.  See R. 756, 788-789, 842, 859-61, 909.  Though the ALJ indicated that her treatment included a "significant regimen" of medication, he did not find that this factor outweighed other evidence limiting her credibility.  R. 31.

Another factor the ALJ must consider in making a credibility determination is whether the claimant's allegations are consistent with her daily activities.  20 C.F.R. § 404.1529(c)(3).  The ALJ found Ms. Roberts' alleged pain to be inconsistent with the daily activities that she described in her examination with Dr. Modlik.  R. 29.  Ms. Roberts said that she could do simple or short cooking, fold laundry, do light cleaning chores, and drive up to twelve miles.  R. 615.  Although the ALJ admitted that Ms. Roberts' reported activities were "quite limited,"  he found that they "greatly exceeded the substantially restricted function

and activities that she alleged." R. 29. The ALJ found that Ms. Roberts' alleged "severely restricted activities of daily living" were "not supported by substantial evidence in the record." R. 30. The lack of medical evidence supporting Ms. Roberts' restricted activities, R. 30, and the fact that Ms. Roberts' pain complaints after the surgeries were "generally those of non-specific pain," R. 29, led the ALJ to conclude that Ms. Roberts' allegations of total disability were "not entirely credible." R. 30.

The ALJ's observations of Ms. Roberts' behavior at the hearing further discredited her allegations of incapacity and immobility. *Id.* Ms. Roberts indicated in her disability questionnaire that she could not sit at her desk for more than twenty minutes, R. 128, and she testified that she could not sit for very long. R. 1074. At the hearing, the ALJ observed Ms. Roberts sitting for an hour and fifteen minutes continuously with very little expression of pain, R. 29, leading him to conclude that her functional capacity in sitting far exceeded her alleged ability. R. 31.

The Seventh Circuit has expressed doubts about the so-called "sit and squirm" test, but has acknowledged that the ALJ may base credibility determinations upon such observations. *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000). The ALJ did not base his credibility determination solely upon Ms. Roberts' demeanor. Because the ALJ is in the best position to observe the demeanor of a witness, an ALJ's credibility determinations are afforded special

deference.   The ALJ did not err in considering Ms. Roberts' daily activities or demeanor in determining her credibility.

Based on the evidence in the record,  the ALJ's credibility determination is not patently wrong or based on serious errors in reasoning.   To the ALJ, Dr. Reilly's opinion combined with Ms. Roberts' continued "significant regimen of pain medication" did not outweigh the other medical evidence, Ms. Roberts' daily activities, and her "demonstration of a significantly higher functional capacity" at the hearing.  R. 31.  Furthermore,  Dr. Hutson's testimony in its entirety indicated that Ms. Roberts could sustain full time sedentary work if she were allowed to stand for five minutes every hour.  The ALJ explained his credibility determination sufficiently in this close and complex case.  The ALJ's residual functional capacity determination is supported by substantial evidence in the record.

### Conclusion

For the foregoing reasons, the ALJ's decision denying benefits is supported by substantial evidence and does not reflect a legal error that would require remand.  Accordingly, the decision is affirmed and final judgment will be entered.

So ordered.

Date: June 23, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Timothy J. Vrana
tim@timvrana.com

Tom Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov